# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL BROTHERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 06 C 7088 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| MICHAEL J. ASTRUE | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION & ORDER

Michael Brothers ("Brothers") seeks judicial review of a decision by the Commissioner of Social Security ("Commissioner") in which the Commissioner granted Brothers only partial relief on his claim for disability insurance benefits ("DIB") and Supplemental Social Security ("SSI"). Brothers applied for these benefits on December 11, 2001, claiming that he had been disabled since November 17, 2001. That application was denied on March 7, 2002, as the Commissioner found Brothers capable of performing light work. Brothers filed a subsequent application on January 30, 2003, which was denied April 7, 2003 for the same reason. Brothers requested reconsideration, which was denied, and then sought a hearing before an Administrative Law Judge ("ALJ"). The ALJ held a hearing and, on June 21, 2005, found that Brothers was entitled to disability benefits as of October 22, 2004. Brothers appealed the partially favorable decision, but the Appeals Council denied his request for review on October 24, 2006. Brothers filed a complaint in this court on December 22, 2006 and has moved for summary judgment. For the reasons stated below, the case is remanded.

# I. BACKGROUND

Brothers was born on December 15, 1951. He has a high school education, and completed an associate's degree in computer science in 1992. In 2003, he completed one year of a ministry preparation program at the Chicagoland Christian Center. He has not, however, worked in the computer science field nor has he completed his training to become a fully ordained minister. His past employment history includes custodial work, asbestos abatement work, and equipment distribution—all jobs that are classified as unskilled occupations which require medium-to-heavy exertion. (R. 300.)

Brothers claims that he suffers from degenerative joint disease in his knees, obesity, diabetes mellitus, acute lower back and neck pain, bilateral pain in his hands, and impaired use of his hands. He argues that his obesity (Brothers is 5′7″ and has consistently weighed between 265-80 pounds) exacerbates these conditions, and that he has suffered from these conditions to a degree that he has been incapable of work since November 17, 2001. There appears to be no debate that Brothers' last substantial gainful activity occurred in 2001.

## A. Medical History

On February 7, 2000, Brothers was treated at the Cook County Hospital Emergency Room for pain and edema in his left knee and lower back pain. (R. 197-98.) The hospital prescribed ibuprofen and referred Brothers to the orthopedic department. (R. 198.) On June 25, 2000, he returned with the same complaints. (R. 196.) On June 28, 2000, Brothers underwent evaluation for his knees; x–rays showed degenerative joint disease ("DJD") in the left knee and findings "suggestive of early DJD" for his right knee. (R. 192.) He also complained at that time that his fingers "popped" out of joint in his left hand. (R. 190.) A doctor at the hospital provided Brothers with a letter stating that his evaluation was

ongoing and that he was not to climb stairs at work until his evaluation was complete, although he could return to work. (R. 193.)

Brothers was next treated following a car accident on October 21, 2001 for pain in his left shoulder and in his neck. (R. 176.) He was diagnosed with neck pain and strain and received a prescription for Motrin and Toradol. (R. 179-80.) Brothers refused to sign his discharge papers, and his treatment notes indicate that he "refused to go home," although he was "laughing and ambulatory." (R. 178-80.)

Following Brothers' emergency treatment, he received follow-up care from Dr. Earl Thornton. Dr. Thornton saw Brothers regularly from the end of October until mid-December of that year. (R. 211.) On October 29, 2001, Dr. Thornton wrote a letter noting that Brothers was "incapacitated and unable to work on the dates of October 21, 2001 through October 28, 2001" due to acute lower lumbar strain, and that Brothers would return to work on October 29th. (R. 200.) At that time, Dr. Thornton noted that Brothers' prognosis was "good." Dr. Thornton treated Brothers using therapeutic exercises, diathermy, hot packs, and ibuprofen. (R. 211.) Dr. Thornton also issued a medical report which listed Brothers' prognosis as "guarded" and listed the total dates of disability as lasting from October 21, 2001 until November 11, 2001. *Id.*

On January 29, 2002, Dr. M.S. Patil performed a consultative examination on Brothers pursuant to a Disability Determination Services request. (R. 201.) At the time, Brothers weighed 278 pounds; he complained of swelling in the knees; mild to moderate pain in his neck, lower back, shoulders, and knees; and stiffness and popping in his joints. *Id.* Brothers claimed that his car accident had exacerbated his back and neck pain. *Id.* Dr. Patil found Brothers' sight to be 20/30 in each eye without correction. (R. 202.) Brothers' appearance, thinking, and judgment appeared normal; he also had reflexes that

were "brisk and equal bilaterally throughout," and his "co-ordination was intact." *Id.* Dr. Patil reported that Brothers had no swelling in his extremities or musculoskeletal system, nor was there any swelling in Brothers' joints. (R. 203.) The fine and gross manipulative movements of Brothers' hands and fingers were within normal limits, and he was able to make good grips and oppose his thumbs. (R. 203.) Brothers' flexion and extension were somewhat limited in his knees (130 on a scale from 0-150 for each), but although Dr. Patil noted that arthritis and obesity are co-morbid conditions, he did not make any finding relating to arthritis. *Id.* He did note, however, that the results of a past workup were not available for review.

A month later, on February 28, 2002, Dr. Harry Bergmann performed a Residual Physical Functional Capacity Assessment. (R. 163.) Dr. Bergmann opined that Brothers should be able to lift and carry twenty pounds occasionally and ten pounds frequently; stand and walk for about six hours, and sit for about six hours in an eight-hour workday; occasionally climb, kneel, crouch, and crawl; and frequently balance and stoop. (R. 164-65.) The report also mentions that no manipulative limitations or visual limitations had been established. (R. 166.)

On March 10, 2003, Brothers underwent another consultative examination with internist Dr. Margaret Stronska. (R. 171.) At that time, Brothers weighed 274 pounds. He again described pain in his knees, and while he did not use a cane, he did claim to use ibuprofen to treat his pain. *Id.* Brothers also disclosed that he had been diagnosed with diabetes six years prior, but that he had "run out" of insulin and had no insurance. *Id.* Dr. Stronska found that Brothers had 20/20 uncorrected vision in both eyes, and had full flexion and extension as well as full strength in his shoulders, elbows, wrists, hips, and ankles. (R. 173.) Consistent with Dr. Patil's report, Dr. Stronska noted that Brothers'

had somewhat limited flexion and extension in his knees (130 on a scale from 0-150 for each), and a "4" out of "5" in terms of knee strength. *Id.* During the examination, Dr. Stronska observed that Brothers could undress, rise from his chair, climb on the examination table, and walk fifty feet without any assistance. (R 172.)

On March 28, 2003, Dr. Vidya Madala completed a second Physical Residual Functional Capacity Assessment. (R. 155-62.) This assessment was made from a review of Dr. Stronska's report. (R. 162.) Dr. Madala opined that Brothers could lift and carry twenty pounds occasionally and ten pounds frequently; stand, walk, or sit for about six hours in an eight-hour workday; and that Brothers had no limitations on his pushing and pulling. (R. 156.) The doctor also found that Brothers could not climb ropes, scaffolds or ladders and that he could not crouch, although he could occasionally climb ramps or stairs and stoop, kneel, or crawl. (R. 157.) Dr. Madala further stated that Brothers should avoid concentrated exposure to extremes of cold and heat, humidity, and hazards such as heights. (R. 159.) On July 24, 2003, another state agency physician, Dr. Frank B. Norbury, reviewed the record and affirmed this assessment. (R. 162.)

On August 14, 2003, Dr. Thornton filled out a Medical Source Statement regarding Brothers' ability to do physical work-related activities. (R. 152.) Dr. Thornton stated that Brothers suffered from severe lumbar pain after standing, walking, or prolonged sitting, and that Brothers could not push, pull, lift, or carry more than ten pounds due to his back pain. (R. 153.) Dr. Thornton found that Brothers could only stand or walk for less than two hours, and could sit for less than six hours, in each eight-hour workday. (R. 152-53.) Dr. Thornton further opined that Brothers should never climb, balance, crouch, or crawl, and should only occasionally kneel. (R. 153.) Consistent with Dr. Madala's opinion, Dr. Thornton also found

that Brothers should have only limited exposure to temperature extremes, vibration, humidity, or hazards such as machinery or heights. (R. 154.)

No additional medical findings are in the record until more than a year later, in November of 2004. On the third of that month, Brothers visited the Stroger Hospital ER with intermittent chest pain. (R. 217.) Brothers was told to return for a follow-up visit, and to take one aspirin daily. (R. 218.) He received a referral for an exercise treadmill test. *Id.*

After Brothers' hearing before the ALJ, he received an additional evaluation by Dr. James Elmes. (R. 222.) That examination took place on April 22, 2005, and those records show that Brothers complained of bilateral knee pain since 1988; low back and neck pain related to the car accident; and bilateral hand pain during the previous two or three years. *Id.* Dr. Elmes found that Brothers did not have a noticeable limp, nor did Brothers complain of pain while walking; he could also walk fifty feet inside the office with ease. (R. 224-25.) Brothers had fairly normal fine motor coordination and could write "okay," but was tired after two to three lines. *Id.* Dr. Elmes measured Brothers' grip strength between forty-five and sixty pounds on the right and between forty and fifty pounds on the left; his upper extremity strength was measured to be five out of five, while his lower extremity strength was four out of five due to bilateral knee pain. (R. 225.) Dr. Elmes found no measurable atrophy in his arms or legs. *Id.* Brothers had a normal range of motion in his joints, save for his lumbo-sacral spine, cervical spine, and knees. (R 229.) Dr. Elmes identified sixteen clinical problems, including early arthritis in Brothers' left knee; non-specific bilateral pain in Brothers' knees, ankles, hands, and wrists; diabetes mellitus; exogenous obesity; and decreased vision. (R. 226-27.)

Based on his findings, Dr. Elmes found that Brothers could lift or carry ten pounds, push or pull a maximum of fifteen pounds, and stand or walk for at least two

hours in an eight-hour work day. (R. 227.) Brothers could occasionally climb ramps and stairs, but he could not climb ladders, ropes, or scaffolds; nor was he to kneel, crouch, or crawl. *Id.* Dr. Elmes further noted that Brothers had limited fine manipulation abilities, and that his vision was limited. (R. 228.) Finally, consistent with Dr. Thornton's findings, Dr. Elmes stated that Brothers should not be exposed to temperature extremes, vibration, humidity, or hazards. (R. 233.)

### B. Brothers' Testimony

At his March 17, 2005 hearing before the ALJ, Brothers testified that he had been taking medication for his diabetes, and that he been out of medication for about six months due to financial reasons. (R. 252-53.) In the past, he had obtained his diabetes medications from the county hospital. *Id.* Brothers disclosed that he lived with his wife, whom he married in December 2003. (R. 263-64.) He stated that based on his condition, he was limited to occasional volunteer work involving his church. (R. 268.) At the time, he was hoping to complete his schooling to become an ordained minister, but his studies were on hold due to financial constraints. (R. 269.) He also stated that he had a valid driver's license without any restrictions, but had occasional trouble with blurry vision due to his diabetes. (R. 270-71, 296.)

Brothers then reviewed his employment history with the ALJ, and stated that his knee problems kept him from being able to work. (R. 278.) The ALJ asked Brothers why he did not pursue help for his knee pain, and Brothers responded that he got "frustrated and aggravated" trying to obtain help. (R. 279.) Brothers claimed to manage his pain through taking five to six Tylenol a day. (R. 279, 297.) When asked if he had any mental or emotional problems, Brothers stated that he was "extremely depressed" although he did not indicate that he had spoken with a doctor about that issue. (R. 283.)

In describing his typical day, Brothers noted that he could dress himself and perform light housework including taking out the garbage, washing the dishes, sweeping, and going to the store, although he did not do any repair work. (R. 285-86, 296-98.) He also attended church on Sundays and bible classes twice a week. (R. 287.)

The ALJ asked Brothers to evaluate his strength and stamina. Brothers estimated that he could lift about twenty-five to thirty pounds with both hands, and that he could not stand still for any significant amount of time due to pain in his knees. (R. 288-89.) Nor could he sit still for long periods, although he could walk "a couple of blocks" at a time. (R. 289.) He testified that he presently weighed about 280 pounds and that weight had been pretty stable. (R. 290.)

During examination by his counsel, Brothers disclosed that he had had hand surgery after one of his fingers was slammed into a door; as a result, he stated that his hands would shake when he had to lift heavy objects. (R. 293.) He reiterated that he has stiff joints, and that to relieve himself of pain in his neck, back, and shoulders he would lie on the floor or a hard surface. (R. 295.) Finally, Brothers testified that he was in the process of being added to his wife's insurance, although he was not certain whether he had been added at the time of the hearing. (R. 299.)

## C.    Vocational Expert Testimony

The ALJ had vocational expert Susan Entenberg testify as to Brothers' work prospects. Entenberg testified that Brothers' past work constituted either medium or heavy unskilled labor. (R. 300.) The ALJ then presented Entenberg with a hypothetical person who was fifty-three years of age; had a high school education, an associate's degree, and a certificate for the ministry; previously had been employed performing

medium to heavy unskilled labor; and could perform work requiring light exertion.  (R. 301.)  The ALJ also made it clear that this person should never do constant repetitive pushing or pulling against resistance with his lower extremities; climb ladders, ropes, or scaffolds; work on moving or unstable surfaces; kneel or crawl; or be exposed to extremes of temperatures, unprotected heights, or unguarded hazardous equipment.  *Id.*

Entenberg identified the "light, unskilled" category as one in which the hypothetical person could be employed, and further testified that within the Chicago metropolitan area, there were about 30,000 light housekeeping positions, 40,000 cashier positions, and 25,000 assembly positions that would qualify.  *Id.*  It appears that the ALJ then asked whether these types of occupations would require someone to be "100 percent on task and productive" other than during sanctioned break periods.[1]  (R. 301-02.)  Entenberg responded that the most a person could be "off task" would be between five and ten percent; anything more would preclude employment.  (R. 302.)

Under questioning by Brothers' counsel, Entenberg stated that "light work" required the person to be able to stand or walk for six hours in an eight-hour day.  (R. 303.)  Entenberg agreed that a person who was unable to stand for more than five minutes at a time would be limited to sedentary work.  (R. 304.)  When presented with the hypothetical of a person who has to stand for five minutes after sitting for twenty minutes, Entenberg stated that this type of position shifting "would be beyond what really would be allowed."  (R. 304-05.)  While Entenberg agreed that a person who could not stand or walk more than five minutes out of an eight-hour workday would be unemployable, she also stated that a person who could stand and walk less than two hours

---

[1]     The transcript reflects that this question was part of Entenberg's answer, but it seems that the transcript is incorrect. A number of responses denoted as "Answers" in the transcript are, in fact, questions.

in an eight-hour day would not be totally precluded from all sedentary employment. (R. 306.)

**D.    ALJ Decision**

After the hearing, Administrative Law Judge Helen Cropper held the record open to obtain additional medical records from Dr. Thornton and to receive the results from Dr. Elmes' consultative orthopedic examination. (R. 14.) The ALJ issued her fourteen-page ruling on June 21, 2005. The ALJ found that although Brothers did not have an impairment that was listed in 20 C.F.R. pt. 404, subpt. P, appx. 1, he nonetheless qualified as "disabled." In making this determination, the ALJ progressed through the five-step process set forth in 20 C.F.R. § 404.1520(a)(4) as follows.

First, the ALJ evaluated whether Brothers had engaged in any substantial gainful activity ("SGA"). Consistent with Brothers' testimony, the ALJ found that his Social Security records did not indicate that he had earned a wage after 2001. (R. 16.) Thus, the ALJ concluded that Brothers had not engaged in any disqualifying SGA.

Second, the ALJ evaluated Brothers' impairments, finding that Brothers' obesity, degenerative joint disease, and diabetes imposed at least a minimal restriction on his ability to perform work-related activities. *Id.* The ALJ did not credit Brothers' claim that he was suffering from depression, because there was no objective medical evidence of record to support such a claim.

Third, the ALJ evaluated Brothers' impairments and found that they were not so severe as to meet or equal a listed impairment. Brothers' degenerative joint disease did not satisfy the requirements for a "major dysfunction of a joint," because Brothers did not have a documented inability to ambulate effectively for twelve continuous months. And

while Brothers suffered from Level III (or extreme) obesity, the obesity also had not resulted in a documented inability to ambulate effectively. Finally, Brothers' diabetes was controlled with oral medication, and there had been no documented severe complications. As a result, the ALJ concluded that Brothers did not suffer from a listing-level impairment. (R. 18.)

The ALJ next evaluated Brothers' Residual Functional Capacity ("RFC"). In doing so, the ALJ undertook a detailed review of Brothers' medical history. She concluded that she would not give controlling weight to the opinion of Dr. Thornton, both because Dr. Thornton only treated Brothers for three months in 2001, and because Dr. Thornton did not provide any progress notes or other clinical bases to support his August 2003 RFC opinion. (R. 21.) She did give "some" credit to the opinions of the Disability Determination Services doctors, and gave "great" weight to the 2005 opinion of Dr. Elmes. The ALJ also evaluated Brothers' subjective complaints and his description of his activities. Based upon her review, the ALJ concluded that Brothers had the ability to perform and sustain a wide range of sedentary work. (R. 23.) However, as previously noted, Brothers' past work had all been classified as medium-to-heavy unskilled labor. Consequently, the ALJ found that Brothers could not perform any of his past work.

Finally, the ALJ considered whether Brothers could perform any other type of work. She found that although Brothers had more than just a high school education, he had only an unskilled work background. Because his RFC permitted only sedentary work, the ALJ determined that Brothers was disabled.

The ALJ then established the onset date of Brothers' disability. Pursuant to SSR 83-20, 1983 WL 31249 (1983), the ALJ considered three factors: Brothers' own

allegations, his work history, and the medical evidence of record. (R. 25.) The ALJ recognized that Brothers alleged disability since November of 2001, and that Brothers had not worked since that time. *Id.* The ALJ also recognized that Brothers did not have any routine outpatient care since December of that year.

In evaluating the medical evidence, the ALJ noted that the consulting physicians who examined Brothers in 2002 and 2003 described his gait as normal and unassisted, and found that he had good bilateral manual dexterity and strength. In fact, no medical evidence supported decreased use of Brothers' hands until early 2005. Thus, the ALJ decided to set the onset date to October 22, 2004—six months prior to Dr. Elmes' examination. The ALJ found that Brothers could have sustained light work in the regional economy prior to October 22, 2004 and that such work existed in significant numbers. Based on her reasoning, she declined to reopen any of Brothers' prior applications for benefits and only awarded him benefits based on the January 30, 2003 application. (R. 26.)

## II. DISCUSSION

### A. Standard of Review

"Where, as here, the Appeals Council denies a claimant's request for review, the ALJ's ruling becomes the final decision of the Commissioner." *Murphy v. Astrue*, 496 F.3d 630, 633 (7th Cir. 2007). A district court's review of an ALJ decision under 42 U.S.C. § 405(g) is very limited. The court may not engage in its own analysis as to whether a plaintiff "is severely impaired as defined by the SSA regulations." *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor is the court permitted to reweigh evidence, resolve conflicts in the record, decide questions of credibility, or substitute its own judgment. *Id.* Instead, the court is to ensure that the ALJ applied the proper legal

criteria and that the ALJ's factual findings are supported by substantial evidence. *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011). "Substantial evidence" requires "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'"—in other words, "more than a scintilla" but "less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

This standard does not, however, require the ALJ to address all of the evidence presented; instead, the ALJ is only required to "provide a 'logical bridge' between the evidence and the conclusions." *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010) (quoting *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008)); *see Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) ("In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review."). Moreover, an ALJ's credibility determinations are entitled to "special deference," and are reversed only if "patently wrong." *Jones*, 623 F.3d at 1160.

**B.      Analysis**

Brothers points to four errors that he believes invalidate the ALJ's disability determination. First, he claims that the ALJ's conclusion that he was capable of light work was erroneous. Second, Brothers argues that the ALJ erred in refusing to reopen his earlier claim for DIB and SSI. Third, Brothers states that the ALJ improperly discounted his testimony. Finally, Brothers alleges that the ALJ provided the vocational expert, Entenberg, with an incomplete hypothetical, rendering the ALJ's conclusions based upon the expert's testimony erroneous. The court addresses each argument in turn.

1.    <u>Brothers' Ability To Perform Light Work</u>

Brothers argues that the ALJ's determination that he was capable of performing light work prior to October 22, 2004 is erroneous, because the ALJ (1) improperly weighed the underlying medical evidence, (2) made unsupported medical conclusions in determining Brothers' onset date, and (3) failed to consider the combined effect of Brothers' obesity with his other impairments.

a)    <u>Weighing Medical Evidence</u>

Brothers first takes issue with the ALJ's decision to give greater weight to the opinions of other doctors in lieu of Dr. Thornton's. While Brothers recognizes that Dr. Thornton only treated him for three months in 2001, he seems to believe that as a treating physician, Dr. Thornton's opinion should be granted controlling weight over any other non-treating, or non-examining, physician.

The ALJ did not err in giving little weight to Dr. Thornton's opinion. "In assessing conflicting medical opinion evidence, ALJs must consider a variety of factors, including whether a physician is a treating or examining physician; the length, nature, and extent of the treatment relationship; the physician's specialty; and the consistency and supportability of the physician's opinion. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996). In *Books*, the Seventh Circuit noted that while an ALJ must "take into account the treating physician's ability to observe the claimant over a longer period," *id.* (quoting *Stephens v. Heckler*, 766 F.2d 284 (7th Cir. 1985) (quotation marks omitted)), a treating physician's opinion "is not the final word on a claimant's disability." *Id.* (*quoting Reynolds v. Bowen*, 844 F.2d 451 (7th Cir. 1988) (quotation marks omitted)).

Here, the ALJ found that although Dr. Thornton had treated Brothers on an on-going basis, that relationship—which stemmed from a minor car accident—lasted just

three months. The ALJ noted that the RFC evaluation form Dr. Thornton completed in August of 2003—some twenty months after Brothers' last documented visit—had been supplied by Brothers' counsel. She also relied upon the fact that, as of 2001, Dr. Thornton and his associates had expected Brothers to return to work in a few months. Coupled with the lack of progress notes or any clinical basis for the 2003 RFC opinion, the ALJ had a more than adequate basis to discount that opinion. In addition, she did not state that she gave Dr. Thornton's opinion no weight; instead, she merely said that she did not give it controlling weight.

The Disability Determination Services opinions were given "some credit" by the ALJ, as those opinions were consistent with and supported by the evidence of record. The ALJ made it clear, however, that she relied in large part on the opinion of Dr. Elmes. The decision to afford that opinion—rendered recently by an examining orthopedic specialist who had the benefit of current x-rays—"great weight" is supported by the record, and the court will not revisit that decision here. *See Young*, 362 F.3d at 1001 ("Weighing conflicting evidence from medical experts . . . is exactly what the ALJ is required to do. . . . And we may not re-weigh the evidence.").

Additionally, Brothers implies that the ALJ failed to make "every reasonable effort" to obtain additional records from Dr. Thornton. To the contrary, the record clearly reflects that the ALJ did just that. (R. 72-74.) The "every reasonable effort" language Brothers cites comes from 20 C.F.R. § 404.1512(d), which states that the Social Security Administration will "make every reasonable effort to help [a claimant] get medical reports from [the claimant's] own medical sources." The regulation goes on to define what is "reasonable": it means the Administration will make an initial request

from the medical source and, ten to twenty days thereafter, it will make one follow up request. 20 C.F.R. § 404.1512(d)(1). Here, the ALJ issued a subpoena on April 7, 2005 and made a follow-up request on April 22, 2005. Despite making every reasonable effort to obtain the documents from Dr. Thornton, the ALJ was unable to do so. Nothing more was required.

Brothers next argues that the ALJ erred in not requesting a medical source statement from each doctor who provided an evaluation pursuant to a Disability Determination Services request. However, the relevant portion of the C.F.R. expressly states that while these requests are ordinarily made, "the absence of such a statement in a consultative examination report will not make the report incomplete." 20 C.F.R. § 1519n(c)(6). Brothers does not cite any authority, nor is the court aware of any, that mandates a different result in this case. Accordingly, this argument is rejected.

b)      Disability Onset Date

Having given great weight to Dr. Elmes' opinion, the ALJ set Brothers' disability onset date as being "six months prior to the date of Dr. Elmes' examination." (R. 25.) Brothers argues, and the court agrees, that this determination is not supported by substantial evidence. The ALJ recognized that she was obliged to apply SSR 83-20, which requires a decisionmaker to consider the applicant's allegations, the applicant's work history, and the medical evidence in determining a disability onset date. SSR 83-20 goes on to state, however, that a disability onset date "must have a legitimate medical basis. At the hearing, the [ALJ] should call on the services of a medical advisor when onset must be inferred." SSR 83-20.

Thus, in general, when an ALJ must draw such an inference, the ALJ is obliged to consult a medical advisor. *See Henderson v. Apfel*, 179 F.3d 507, 513 (7th Cir. 1999). While the Seventh Circuit does not require a consultation if the medical evidence of record is "complete," *see id.*, the exception is inapplicable here. Dr. Elmes evaluated Brothers in April of 2005. Prior to that, Brothers' last two examinations occurred in November of 2004 (when he visited the ER for chest pain) and in March of 2003 (when Dr. Stronska examined him pursuant to a DDS request). The court recognizes that Brothers' own lack of diligence in seeking medical care contributed to the sparse record, but the fact remains that absent a complete record, the ALJ is not permitted to forego the assistance of a medical advisor.

Moreover, even assuming *arguendo* that the ALJ did not need to consult a medical advisor, there is no evidence to support the ALJ's chosen onset date. Simply put, nothing happened on October 22, 2004. The ALJ did not provide any explanation as to why that was her best guess, nor does Dr. Elmes' report provide a clue as to why October 22, 2004 was chosen—he did not, for instance, indicate the rate at which Brothers' various ailments had progressed. Instead, that date appears to have been chosen because the ALJ believed that Brothers had become disabled at some point in between Dr. Stronska's 2003 evaluation (which resulted in an RFC that supported the ALJ's conclusion that Brothers was capable of light work) and Dr. Elmes' 2005 evaluation (which supported the ALJ's conclusion that Brothers was capable of sedentary work). The court must conclude that the ALJ's determination of an onset date is not supported by substantial evidence.

Accordingly, the court remands the case for the ALJ to obtain assistance from a medical advisor in making a supported onset-of-disability determination. The court notes, however, that "[i]n assessing the correctness of the onset date determined by the ALJ, 'the issue is whether there is substantial evidence in the record to support the date chosen by [the ALJ], not whether an earlier date could have been supported.'" *Henderson ex rel. Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999) (quoting *Stein v. Sullivan*, 892 F.2d 43, 46 (7th Cir. 1989)). The court's ruling should not be taken to indicate that an earlier date necessarily would be appropriate; after all, "the established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record." SSR 83-20.

c)    Combined Effect of Impairments

Brothers claims that the ALJ "failed to sufficiently discuss the effect of [Brothers'] obesity, in combination with his other impairments, on his ability to work." The court disagrees. The ALJ expressly mentioned Brothers' obesity when she evaluated the severity of his impairments; in fact, the ALJ specifically stated that she evaluated Brothers' impairments "separately and in combination," and that they did not rise to the level of a listed impairment. In that same paragraph, she discussed Brothers' obesity, noting that it "no doubt contributes to his joint pain and [diabetes]." The ALJ also made repeated mention of Brothers' weight in evaluating the medical evidence of record. The court agrees with the Commissioner that when taken as a whole, the ALJ's decision indicates that she considered the effect of Brothers' obesity in exacerbating his other impairments. *See Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004) (noting that it is proper to read an ALJ's decision "as a whole," and refusing to engage in the "needless

formality" of having the ALJ repeat the same analyses at various stages in the five-step process).

        d)    <u>RFC Determination</u>

Brothers takes issue with the ALJ's conclusion that prior to October 22, 2004 he was capable of performing light work. Because this conclusion rests in part upon the ALJ's determination of a disability onset date, for the reasons stated above it is not supported by substantial evidence. However, the court briefly notes that the medical evidence of record prior to Dr. Elmes' April 22, 2005 examination appears to be consistent with an RFC assessment that Brothers was capable of performing light work.

        2.    <u>Reopening Earlier Claims</u>

In rendering her decision on Brothers' January 30, 2003 application for benefits, the ALJ noted that Brothers had filed a number of earlier applications. After stating that her decision was only partially favorable based on the October 22, 2004 disability onset date, the ALJ went on to state that Brothers was "not entitled to reopen the adverse decision" on his earlier applications. Brothers claims that the ALJ erred in basing her decision on Brothers' disability onset date, instead of making the determination "initially, based upon how much time has gone by." He roots this argument in the text of 20 C.F.R. § 404.988(a), which states that "[a] determination may be reopened . . . [w]ithin 12 months of the date of the notice of the initial determination, for any reason." According to Brothers, because he filed his January 30, 2003 application within twelve months of the date his earlier application was denied (on March 7, 2002), the ALJ should have reopened the earlier application automatically.

The regulation states that an ALJ "may" reopen a decision for any reason; nothing requires the ALJ to do so, and Brothers has not pointed to any precedent in support of his theory that the ALJ should have done so in this case. Nor does he articulate any actual prejudice that he suffered due to the ALJ's decision.[2] Thus, even assuming that the ALJ mistakenly declined to reopen earlier applications, if Brothers suffered no harm, he would not be entitled to remand. *See Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) ("The doctrine of harmless error indeed is applicable to judicial review of administrative decisions.").

Based on the ALJ's belief that Brothers was not disabled until October 22, 2004, the ALJ's decision not to reopen earlier applications was perfectly reasonable. However, as established above, the ALJ's determination as to Brothers' onset date is not supported by substantial evidence. Consequently, if a different onset date is dictated by the evidence, and that onset date renders the earlier applications relevant and non-duplicative, then the ALJ may need to revisit her decision as to the earlier applications. The court takes no position as to whether the ALJ should actually reopen the earlier applications, as that is a matter within the ALJ's discretion.

### 3. Credibility Determination

In making her RFC determination, the ALJ discussed Brothers' testimony in detail, and then concluded that she could not give "full credit" to Brothers testimony "that he suffers from disabling musculoskeletal pain, severe or frequent chest pain, disabling symptoms of hyperglycemia or extreme depression." (R. 22.) The ALJ based this

---

[2] Although Brothers states in his reply that "[t]he ALJ's failure to reopen the prior determination excludes consideration of any prior medical evidence and forms submitted with the prior claim" (*see* Pl.'s Reply at 13), Brothers has not identified anything of the kind that was actually excluded.

decision on the fact that Brothers rarely obtained recommended follow-up medical care, and did not take steps to be added to his wife's health insurance plan. She noted that Brothers participated actively in his church and had completed a lengthy program to become a minister. (R. 23.) The ALJ mentioned that Brothers had no prescribed medication for pain and relied upon over-the-counter strength medication to alleviate his symptoms. In addition, although Brothers complained of difficulty in using his hands, he had not mentioned that problem to any doctor until his 2005 evaluation with Dr. Elmes. Earlier in her opinion, the ALJ also had addressed Brothers' claims to depression, finding that Brothers had never told any treating or examining physician about the alleged depression, and no consulting doctor ever observed any clinical sign of mental illness or abnormal mental status. (R. 16.)

Brothers argues that the ALJ made a number of errors in deciding not to give his testimony full credit. For instance, Brothers attempts to challenge the ALJ's statement that he had no prescribed medication for pain by pointing to the fact that he received prescription-strength painkillers when he sought medical treatment in the past. This in no way contradicts the ALJ's statement. Brothers was not taking prescription painkillers at the time of the hearing, nor is there any evidence he had an unfilled prescription outstanding; instead, he reported self-medicating with Tylenol. To the extent the ALJ inferred from that fact that Brothers' pain was not severe enough to cause him to seek out prescription medications, this is a reasonable inference.

The same is true of Brothers' claim that the ALJ erred in stating that Brothers had not previously mentioned any difficulty with his hands. In support, Brothers points to a June 2000 medical report in which Brothers reported his that his fingers would "pop" out

of joint in his left hand. (R. 190.) But again, the ALJ's statement is not inconsistent with this medical record. Having a finger "pop" out of joint does not necessarily indicate any pain, discomfort, or inability to use one's hands. And other than Dr. Elmes' post-hearing evaluation, this is the only mention of any issue with Brothers' hand. Further, every evaluation prior to Dr. Elmes' April 2005 evaluation indicated that Brothers had full use of his hands. Thus, the ALJ could reasonably conclude that Brothers' testimony regarding his hand problems was not entitled to full credit.

The ALJ also stated that Brothers had not taken steps to be added to his wife's insurance. Brothers argues that this statement is "entirely contrary" to Brothers' testimony. That is not the case. Brothers testified that *his wife* had taken steps to get Brothers added to her insurance. (R. 298-99.) Brothers did not know whether those steps had resulted in him being added, and merely stated that he was "in the process of finding out." (R. 299.) Based on this testimony, the ALJ could reasonably conclude that Brothers had not taken an active role in seeking insurance coverage, thereby undermining his testimony regarding the severity of his symptoms.

For the same reason, Brothers' failure to follow up with routine medical care supports an inference that some of his medical problems were not as severe as he claimed. Brothers asserts that the ALJ violated SSR 96-7p by impermissibly holding Brothers' inability to afford or access medical care against him. But when the ALJ probed as to why Brothers did not obtain follow-up medical care, Brothers responded in part: "I'm not trying to come up with a lot of excuses why I don't do things and I know I should." He mentioned that that he knew he was supposed to be taking medication for his diabetes but was not doing so, and that his wife had purchased a blood sugar monitor

for him a month or two prior to the hearing, but he had not yet set it up. (R. 282-83.) The record also reflects that Brothers knew he could receive free medical treatment at the county hospital, as he did so on a few occasions.[3] Nothing in the ALJ's opinion indicates that she based her reasoning on Brothers' lack of financial resources; instead, she contrasted Brothers' lack of follow up with his active participation in church activities, and drew the inference that this lack of dedication to his health undermined some of Brothers' testimony.

On review of the record, the court cannot say that the ALJ's credibility determination was "patently wrong." *See Jones*, 623 F.3d at 1160 ("Rather than nitpick the ALJ's opinion for inconsistencies or contradictions, we give it a commonsensical reading. Accordingly, we reverse credibility determinations only if they are patently wrong."). As in *Jones*, here the ALJ properly relied upon discrepancies between the objective evidence and Brothers' self-reports. *See id*. at 1161. The ALJ adequately articulated her reasons for not giving Brothers' testimony full credit, and the record supports her conclusion.

### 4. Vocational Expert Testimony

Brothers' last argument is that the Step 5 analysis was erroneous because: (1) the ALJ gave the vocational expert, Ms. Entenberg, a hypothetical that did not contain all of the limitations of Brothers' condition, (2) Entenberg testified regarding the availability of housekeeping jobs, and these jobs require bodily positions (such as kneeling/crouching) that Brothers was incapable of maintaining, and (3) Entenberg testified regarding the

---

[3] Indeed, Brothers' counsel even remarked on this "odd" attitude at the hearing, and stated that he frequently encountered this issue—that is, "where there is free medical treatment to be had and yet it's not had"—in various city locales. (R. 308.)

availability of cashier positions, which are "semi-skilled," even though the ALJ found Brothers only qualified for unskilled work.

The first argument is based entirely upon Brothers' earlier arguments regarding his ability to perform light work. This issue has already been discussed in detail, and will not be revisited here. Suffice it to say that to the extent this line of argument relies upon credibility determinations and the weighing of medical evidence, the ALJ's conclusions will not be disturbed by this court. The remand on this topic is limited to requiring a fresh examination of Brothers' disability onset date.

Next, Brothers claims that the ALJ violated SSR 00-4p by failing to inquire whether Entenberg's testimony regarding Brothers' ability to perform light work was consistent with the Dictionary of Occupational Titles ("DOT"), or the DOT's companion publication, the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles. SSR 00-4p states that when a vocational expert or specialist (a "VE" or "VS") "provides evidence about the requirements of a job or occupation, the adjudicator has an *affirmative responsibility* to ask about any possible conflict between that VE or VS evidence and information provided in the DOT." SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000) (emphasis added); *see Prochaska v. Barnhart*, 454 F.3d 731, 735-36 (7th Cir. 2006). The ruling goes on: "In these situations, the adjudicator will: Ask the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT; and If the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict." SSR 00-4p. Neither the expert's testimony nor the DOT's definitions automatically "trump"—instead, the purpose of the rule is to highlight the conflict so that

the ALJ can determine whether there is a "basis for relying on the VE or VS testimony rather than on the DOT information." *Id.*

Here, the ALJ expressly inquired as to whether Entenberg's classification of Brothers' actual prior work comported with the DOT. (R. 300.) Entenberg testified that there was no difference between the two. Thus, in that regard the ALJ satisfied her obligation. However, the ALJ never asked Entenberg whether there was any conflict between the DOT and the requirements for the "light, unskilled" occupations that Entenberg testified were available in the economy. The Seventh Circuit has made it clear that this inquiry is required before an ALJ can rely upon the expert's testimony. *See Craft v. Astrue*, 539 F.3d 668, 681 (7th Cir. 2008) ("When a VE provides evidence about the requirements of a job or occupation, the ALJ has an affirmative duty to ask about potential conflicts between that evidence and the DOT."); *Prochaska*, 454 F.3d at 736; *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007) (citing cases to this effect in the Third, Seventh, and Tenth Circuits).

The government asks the court to find that this failure was a harmless error. The court cannot do so. The government does not address Brothers' point regarding housekeeping duties and the limitations on Brothers' movements; as to Entenberg's testimony regarding cashier positions, the DOT describes a number of positions with this title, some of which are semi-skilled and some of which are unskilled. As a result, some of these semi-skilled positions are irrelevant to the employment capabilities of the hypothetical person the ALJ described. But because the ALJ did not inquire as to whether there were any inconsistencies between the DOT and Entenberg's testimony, the ALJ was unable to tease out these issues. The court cannot say that the error was

harmless.  Therefore, on remand the ALJ must comply with SSR 00-4p and inquire into whether the expert's testimony conflicts with the DOT; if so, the ALJ is obliged to set forth and resolve that conflict.

### III. CONCLUSION

Because the ALJ's determination as to Brothers' onset date is not supported by substantial evidence, and because the ALJ did not comply with the requirements of SSR 00-4p, the court remands this case to the Social Security Administration for further proceedings consistent with this opinion.

ENTER:

_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED:  June 13, 2011